**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF WEST VIRGINIA**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| Herbalife International, Inc., | ) | |
| | ) | Civil Action No. 5:05-cv-41 |
| Plaintiff, | ) | |
| | ) | Judge Stamp |
| | ) | |
| v. | ) | |
| | ) | **ST. PAUL FIRE & MARINE** |
| St. Paul Fire & Marine Insurance Co., et. al. | ) | **INSURANCE COMPANY'S** |
| | ) | **MEMORANDUM OF LAW IN** |
| Defendants. | ) | **SUPPORT OF MOTION FOR** |
| | ) | **PARTIAL SUMMARY** |
| | | **JUDGMENT** |

Defendant St. Paul Fire & Marine Insurance Company, ("St. Paul"), by its counsel, submits the following Memorandum of Law in Support of its Motion for Partial Summary Judgment against Plaintiff Herbalife International, Inc. ("Herbalife").

## <u>Introduction</u>

This is an insurance-coverage dispute. Herbalife claims that St. Paul has a duty to defend and indemnify it against a class-action lawsuit seeking statutory penalties under the federal Telephone Consumer Protection Act, 47 U.S.C. § 227 (b)(1)(C) ("TCPA"). The class action is titled <u>Diana Mey, Individually and On Behalf of a Class of All Persons and Entities Similarly Situated v. Herbalife International, Inc., Thomas Stiles, Pamela Stiles, Nancy Willis and Dana Willis</u>. (Exhibit A, Complaint, 1). It is currently pending in the Circuit Court of Ohio County, West Virginia. The class's claims arose out of Herbalife's distributors' use of automatic telephone dialing systems to deliver pre-recorded messages to "hundreds of thousands if not

millions" of households nationwide.[1]  (Exhibit A, Complaint, 6).  In this motion, St. Paul asks

this Court to hold that the underlying class's claims do not fall within the coverage of its Medical

and Biotechnology Commercial General Liability Policy.  In particular, St. Paul asks the Court to

hold that its policy's "Advertising Injury" coverage does not apply to the underlying claims,

since that is the provision under which Herbalife is seeking coverage.

The majority of courts to address the issue have rejected the availability of Advertising

Injury coverage for TCPA claims.  Herbalife may point to the few cases finding such coverage,

but none of these cases interprets St. Paul's unique policy language.  Every court that has

examined St. Paul's unique definition of "Advertising Injury" has uniformly determined that St.

Paul's policy does not provide Advertising Injury coverage for TCPA claims.  St. Paul therefore

respectfully requests that this Court order partial summary judgment in its favor and dismiss

Herbalife's claims against it.[2]

<u>**Statement of Undisputed Facts**</u>

**I.      Herbalife Sells Nutritional And Weight Management Products, In Addition To Self-
         Employment Opportunities.**

Plaintiff, Herbalife International, Inc. is a self-described "global network marketing

company."  (Exhibit B, Form 10-K, 3).  Its corporate mission is to "change people's lives by

---

[1] The Ohio County Circuit Court recently limited the <u>Mey</u> class to West Virginia residents who received pre-recorded phone calls after July 16, 1999.  (Exhibit D, Memorandum of Opinion and Order, 33-34 (April 21, 2006)).  It further limited the class to people who did not have a prior business relationship with the defendants, and who did not give the defendants prior express permission to contact them.  (<u>Id</u>.)

[2] St. Paul's motion is for partial summary judgment because one claim would remain outstanding if the motion is granted, namely, St. Paul's claim for reimbursement of defense expenses that it has already paid.  St. Paul is also not asserting every coverage defense applicable to indemnification (and potentially allocation of defense expenses in St. Paul's motion for reimbursement) in this motion.  In particular, St. Paul is not asserting its policy's exclusions for "material previously made known."  Such defenses would be applicable to the duty to indemnify, and therefore cannot be determined at this stage of the underlying litigation.

providing the best business opportunity in direct selling and the best nutrition and weight management products in the world."  (Exhibit C, Herbalife Website, "Our Mission," 1).

Herbalife's corporate structure is decidedly pyramidal; it encourages its independent distributors to "enjoy the possibility of higher levels of income," by "sponsor[ing] others into the business and develop[ing] an organization."  (Exhibit E, Herbalife Website, "Statement of Gross Compensation of U.S. Supervisors in 2004").  "Leaders" can progress from mere "supervisors," up to various "teams," culminating in the "Founder's Circle"  (Exhibit B, Form 10-K, 10). Herbalife's Form 10-K explains that its various "team" members "earn increasing amounts of royalty overrides," as well as "production bonuses on sales in their downline sales organizations."  (Id.)  Such supervisors "contribute significantly to [Herbalife's] sales."  (Id.).  In fact, certain key supervisors are "responsible for their organization's generation of a substantial portion of our sales and for recruiting a substantial number of our distributors."  Distributor recruitment is thus the primary strategy that Herbalife employs to increase its sales or business:

> **Our Business Strategy**
>
> We believe that our network marketing model is the most effective way to sell our products.  Our objective is to increase the recruitment, retention, retailing and productivity of our distributor base by pursuing the following strategic initiatives:
>
> > Distributor Strategy:  We continue to increase our investment in events and promotions as a catalyst to help our distributors improve the effectiveness and productivity of their businesses * * *.

(Id. at 6).

## II.   The Mey Complaint Alleges Claims That Arise Out Of Herbalife's Efforts To Increase Sales Or Business.

The original Mey complaint was filed in April 2001 and asserted a TCPA lawsuit against a single West Virginia Herbalife distributor:  Tom Stiles.  (Exhibit F, Mey v. Stiles Complaint). It complained that the plaintiff, Diana Mey, had been "statutorily damaged" by Stiles's pre-

recorded telephone advertisement, because the message was delivered "without [Mey's] prior express consent," and because it did not provide Stiles's business's name, phone number, or address.  (Id. at 2).  The complaint sought to recover "damages pursuant to the Federal TCPA," in amounts equaling $500 per incident, as well as $1000 in "exemplary liquidated damages" for each knowing or willful violation.  (Id. at 3).

Discovery progressed in the Mey case from April 2001 until June 2003, when Mey filed the class action complaint that is the source of this coverage dispute.  (See Complaint).  The revised Mey complaint added new defendants, including three other West Virginia Herbalife distributors — Pamela Stiles, Nancy Willis and Dana Willis — as well as Herbalife, itself.  (Id. at 1).  The complaint alleged that Herbalife had engaged in "widespread institutional disregard for the TCPA."  (Id. at 2).  It claimed that, over the preceding four years,[3] distributors such as the Stileses and Willises had made "hundreds of thousands of unsolicited pre-recorded telephone calls" and that these calls had been made "by or on behalf of Herbalife" and with Herbalife's "knowledge, consent, approval and/or acquiescence."[4]  (Id.)

The complaint described Herbalife's multi-level marketing structure.  (Id. at 3-5).  It claimed that Herbalife's over-1,000,000 distributors acted as its agents.  (Id. )  It further claimed that, beginning in 1999 (eight years after Congress passed the TCPA) "several top Herbalife distributors" promoted "illegal telemarketing tactics" as a means of recruiting new Herbalife distributors and thereby selling more Herbalife products in their downlines.  (Id. at 6).  The

---

[3] Class representative Diana Mey alleges that she received unsolicited pre-recorded telephone calls at her residence on the following dates:  December 7, 2000, December 10, 2002 and March 31, 2003.  The class purportedly includes members who received such unsolicited pre-recorded calls from July 16, 1999 to December 1, 2000, which pre-dates St. Paul's policy period.

[4] The complaint did not specify the content of the Stiles's and Willis's prerecorded messages, other than to allege that the calls' "true purpose was to promote the sale and distribution of Herbalife products and to recruit new Herbalife distributors for the sale of such products."  (Id. at 10).

complaint claimed that Herbalife was in a "joint venture" with the four West Virginia Herbalife distributors that were named defendants, because they were "engaged in a contractual association * * * to carry out a single business enterprise for profit."  (Id. at 11).

The complaint attached a booklet that was allegedly "developed by the Herbalife Agents," and that encouraged Herbalife distributors to use a four line "Auto Dialer" as part of a 90-day action plan to recruit new Herbalife distributors.  (Id.)  It alleged that the Herbalife distributors claimed that these "Auto Dialers," (including one called the "Herbal Dialer") could make thousands of pre-recorded calls per day.  (See id. at 6-8.  The complaint also alleged that Herbalife benefited from the pre-recorded advertisements in more ways than just the growth of its distributor network:  it claimed that Herbalife "derives compensation from each pre-recorded telemarketing phone call" through its "Herbatel" network, an allegedly Herbalife-owned phone service.  (Id. at 9.  The complaint further alleged that consumers had complained to Herbalife about its distributors' illegal telemarketing, and that Herbalife had brushed aside those complaints, asserting that its distributors were "independent agents" over which Herbalife did not exercise control.  (Id.)

The class action Mey complaint asserted six counts.  Two of the counts sought only injunctive relief:  Count V requested an injunction to bar future TCPA violations; and Count VI sought an injunction for the preservation of evidence.  (Id. at 15-16).  The other four counts sought relief under the TCPA for negligent transmission of "unsolicited prerecorded phone messages," and knowing transmission of the same, as well as negligent and knowing transmission of prerecorded phone messages that failed to identify the source and purpose of the call.  (Id. at 14-16).  It also asserted that Mey's claims met the requirements for a class action. (Id. at 12-14).

III.     **Herbalife Tendered The <u>Mey</u> Lawsuit To St. Paul, And St. Paul Agreed To Defend Herbalife Under A Reservation Of Rights.**

Herbalife tendered the <u>Mey</u> complaint between July 22, 2003 and September 12, 2003. (Exhibit G, September 12, 2003 Letter to Patti Sabel).  St. Paul promptly investigated the claim. (*See* <u>id</u>.)  St. Paul responded to Herbalife's tender via a letter dated September 12, 2003.  (<u>Id</u>.) St. Paul denied coverage on several grounds, including that the claim did not allege a claim for "advertising injury" within the policy's meaning and that the claim was precluded from coverage by the exclusion for material that was "first made known" before the policy period.  (<u>Id</u>. at 2). St. Paul invited Herbalife to provide any additional information that might affect St. Paul's determination.  (<u>Id</u>. at 9).

Between September 12, 2003 and February 16, 2004, St. Paul and Herbalife exchanged correspondence regarding coverage for the <u>Mey</u> complaint.  (Exhibit H,  February 6, 2004 Letter to James Zacharski).  On February 16, 2004, St. Paul agreed to defend Herbalife, subject to a reservation of the right to deny coverage.  (Exhibit I, February 16, 2004 Letter to Scott Vida). St. Paul emphasized that it was deciding to provide a defense based on caselaw that had developed at the time, but that it disputed whether that caselaw was relevant, given the differences between the ISO policy language that was the subject of those decisions, and St. Paul's policy language.  (<u>Id</u>.)

On March 9, 2005, after a series of correspondence regarding Herbalife's defense expenses, St. Paul reiterated its reservation of rights.  (Exhibit J, March 9, 2005 Letter to Scott Vida).  Specifically, St. Paul agreed to reimburse Herbalife for reasonable defense costs that it incurred through its selected counsel.  (<u>Id</u>. at 9).  St. Paul also specifically reserved its right to recover costs and fees if a court later determined that the claims in the <u>Mey</u> lawsuit were not covered under the policy:

> In addition, St. Paul hereby reserves its rights to deny coverage, to withdraw from the defense, to allocate fees and expenses between covered and non-covered claims and to seek to recover from Herbalife any defense costs that St. Paul pays if it is later determined that St. Paul had no duty to defend some or all of those claims.

(Id. at 3).  To date, St. Paul has paid in excess of $1 million in defense costs to Herbalife to cover attorney's fees incurred in defending the Underlying Lawsuit. (Exhibit M, Affidavit of Judi Lamble).

**IV.    Herbalife's Policy With St. Paul Companies Was Negotiated And Delivered In California And Potentially Applies To Herbalife's Operations Worldwide.**

Herbalife is incorporated in the Cayman Islands.  (Exhibit B, Form 10-K, 36).  But its corporate headquarters are in Los Angeles, California.  (Exhibit L, Herbalife Website, 1).  Four of its five United States facilities are in California.  (Exhibit B, Form 10-K, 38 (describing leased properties in Century City, Inglewood, Torrance and Los Angeles, California, as well as Memphis, Tennessee)).  It negotiated its Medical and Biotechnology Commercial General Liability policy[5] with St. Paul through a Los Angeles broker.  (Exhibit K, Policy, K-5 (listing "agent" as "Aon Risk Services Inc. of So Ca, 707 Wilshire Blvd., Suite 6000, Los Angeles, CA 90017").  The policy was delivered to Herbalife at its corporate headquarters in Los Angeles. (Id.).

St. Paul's policy agreed to pay for covered injury or damage in the "coverage territory," which included all 50 states, Puerto Rico, Canada, and international waters or airspace during

---

[5] St. Paul issued Herbalife several successive primary and excess insurance policies, beginning in 2000.  Specifically, St. Paul issued to Herbalife a Series 2000 Technology Medical & Biotechnology Commercial General Liability Policy, policy no. TE06102062, with effective dates from December 1, 2000 to December 1, 2001.  St. Paul also issued the following policies to Herbalife:

- (12/1/01 – 12/1/02)    CGL Primary-Series 2000 Policy, policy No. TE6102062
- (12/1/02 – 12/1/03)    CGL Primary Series 2000 Policy No. TE06102062
- (12/1/02-12/1/03)      Commercial Excess Policy QI09400108
- (12/1/03 – 12/1/04)    Commercial Excess Policy TE06102062
- (12/1/03 – 12/1/04)    Commercial Excess Policy QI06100052

travel.  (Id. at K-28).  It also agreed to pay for covered injury or damage that was "caused by events or offenses which happen or are committed in the rest of the world" if certain conditions were met.  (Id.)  Herbalife does business in the U.S., Europe, Asia/the Pacific Rim, Japan, and other countries, worldwide.  (Exhibit B, Form 10-K, 11).

St. Paul's policy provided coverage for "Advertising injury liability:"

**Advertising injury liability.**  We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:
- Results from the advertising of your products, work, or completed work; and
- Is caused by an advertising injury offense committed while this agreement is in effect.

(Exhibit K, Policy, K-26).  The Policy also specifically defined several of the terms used in the Advertising Injury Liability Coverage Provision, including "advertising," "advertising injury," and "advertising injury offense."

**Advertising** means attracting the attention of others for the purpose of seeking customers or increasing sales or business.

* * *

**Advertising Injury** means injury, other than bodily injury or personal injury, that's caused by an advertising injury offense.

**Advertising Injury Offense** means any of the following offenses:

- Libel or slander.
- Making known to any person or organization written or spoken material that disparages the products, work, or completed work of others.
- Making known to any person or organization written or spoken material that violates a person's right of privacy.
- Unauthorized use of any advertising material, slogan, or title of others in your advertising.

(Id.).

Finally, the policy excluded coverage for any material that was "first made known" prior to the effective date of the Policy:

**Material previously made known**.  We won't cover personal injury or advertising injury that results from written or spoken material which was first made known before this agreement went into effect.

(Id. at K-40 ).

## Argument

### I.    St. Paul Is Entitled To Summary Judgment Unless Herbalife Presents Evidence That Would Support A Verdict In Its Favor.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions of fact, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Once the moving party has met its burden, the non-moving party cannot simply rest on the allegations or denials in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The Supreme Court has instructed that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  "This standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Bouchat v. Balt. Ravens Football Club, 346 F.3d 514, 519 (4th Cir. 2003), writ of cert. denied (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (emphasis in original).  "A material fact is one where its existence or non-existence could result in a different jury verdict."  JKC Holding Co., LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001).

The determination of the "proper coverage of an insurance contract when the facts are not in dispute is a question of law," and the decision is a proper one for summary judgment. Moore v. CNA Ins. Co., 215 W.Va. 286, 289, 599 S. Ed. 2d 709, 712 (2004).

## II.     St. Paul's Motion Is Based On West Virginia Law.

In a diversity action, a federal court "must apply the choice-of-law rules from the forum state." Am. Ins. Co. v. Frischkorn, 173 F. Supp. 2d 514, 517 (S.D. W.Va. 2001). Before engaging in an extensive choice-of-law analysis, West Virginia courts first ask whether there is an actual conflict. See,e.g., Pen Coal Corp. v. William McGee & Co., 903 F.Supp. 980, 984 (S.D. W.Va. 1995). The St. Paul policies were bargained for and agreed to by Herbalife at its corporate offices in California, and potentially covered Herbalife's worldwide operations. Thus, should an outcome-determinative conflict arise, California law would apply. See Liberty Mut. Ins. Co. v. Triangle Indus., 182 W.Va. 580, 390 S.E.2d 562, 567 (1990) (holding coverage determined by law of state where policy was "bargained for, created, and agreed to"). But since St. Paul is not currently aware of an outcome-determinative conflict of law with respect to the issues raised in this motion, it has therefore relied on West Virginia precedent in this memorandum.

## III.    As A Matter Of Law, St. Paul Has No Duty To Defend Or Indemnify Herbalife Under The Policy's Advertising Injury Coverage Part.[6]

### A.     Introduction.

Unlike damage-based insurance like "bodily injury" and "property damage" coverage, advertising-injury coverage is offense based. For coverage to apply, the insured's liability must

---

[6] The many other TCPA coverage cases from across the country have all involved conveyance of advertising via a TCPA-prohibited facsimile transmission. Because receipt of a facsimile typically entails consuming the recipient's paper and toner, the facsimile cases not only have involved claims for coverage under an "advertising injury" coverage part – as here – but also under a separate coverage part for "property damage." Here, however, the underlying action alleges only TCPA-prohibited automated telephone calls; therefore, the recipients' consumables are not implicated, and Herbalife does not seek "property damage" coverage.

arise from actionable conduct that consists of the elements comprising a covered offense.  It is not enough that a given outcome take place, like an invasion of privacy or the disparagement of another's product.  Such a result must also stem from conduct that satisfies the elements of an enumerated offense.   If it does not, coverage is inapplicable.   Here, the policy provides advertising-injury coverage, but it also requires that the claimed injury must be "caused by an advertising injury offense."  (Exhibit K, Policy, 26).  In addition to advertising activity itself, the offense in dispute here consists of these elements:  "Making known to any person or organization written or spoken material that violates a person's right of privacy."  (<u>Id</u>.).  Because the alleged privacy violation did not occur as a result of conduct consisting of the elements required under the insurance contract, coverage is inapplicable.

The missing elements, as discussed in detail below, are "making known . . . material" and "material that violates."  First, the making-known-material element implicates a person's privacy interest in the sense of secrecy (i.e., the privacy interest in not having personal information made known to others).  Therefore, the making-known-material element is met only when there is a disclosure of informational content to someone other than the complaining party.  Here, the underlying complaint alleges a prohibited method of communication <u>with the complaining parties themselves</u>.  And it alleges a type of privacy violation – intrusion upon seclusion – that the policy does not cover.  For these reasons, the liability alleged in the underlying action falls outside the policy's making-known-material element.

Second, the material-that-violates element requires that it be the material – the content – that violates the person's right of privacy.  Here, the underlying complaint alleges not that the advertising material violated the right to privacy, but that the <u>means of conveyance</u> did.  Indeed, the TCPA does not regulate content.  It merely regulates the use of certain means of conveyance – like facsimile transmission and automated callers – that tend to upset the recipient's privacy

interest in seclusion.  As with the first missing element, when a person's right to privacy is violated by informational <u>content</u>, it is the interest in secrecy, not seclusion, that is violated. Thus, if Herbalife is liable as alleged, its liability will not be the result of conduct that consists of the required offense-based elements.

An insurer has no duty to defend unless the underlying complaint, without amendment, alleges a claim that could potentially result in liability within the policy's coverage.  <u>Bowyer v. Hi-Lad, Inc.</u>, 216 W.Va. 634, 609 S.E.2d 895, 912 (2004)(stating that "[a]n insurance company has a duty to defend an action against its insured if the claim stated in the underlying complaint could, without amendment, impose liability for risks"); *see also*, <u>Horace Mann Ins. Co. v. Leeber</u>, 180 W.Va. 375, 376 S.E.2d 581, 584 (1988)(holding that "a liability insurer need not defend a case against the insured if the alleged conduct is entirely foreign to the risk insured against").  Thus, when the underlying action alleges a claim that is beyond coverage as a matter of law, there is neither a duty to defend nor a duty to indemnify.  <u>Erie Ins. Prop. & Cas. Co. v. Pioneer Home Improvement, Inc.</u>, 206 W.Va. 506, 526 S.E.2d 28, 34 (1999)(affirming ruling of no coverage as matter of law and stating:  "The circuit court correctly determined [on summary judgment] that Erie had no duty to indemnify Pioneer. * * * In view of this holding, Erie had no duty to defend"); <u>Waller v. Truck Ins. Exch., Inc.</u>, 11 Cal.4th 1, 5 (1995).  On the issue presented here, the Fourth Circuit has already ruled that identical advertising-injury coverage – a St. Paul policy with the same advertising-injury coverage part – provides no coverage for, or duty to defend against, an alleged TCPA violation.[7]  <u>Resource Bankshares Corp. v. St. Paul Mercury Ins.</u>

_____

[7] Nationwide, the majority of courts that have considered the issue have determined that TCPA claims do not fall within a commercial general liability policy's definition of "advertising injury." <u>Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.</u>, 407 F.3d 631, 639-43 (4th Cir. 2005); <u>American States Ins. Co. v. Capital Assoc. of Jackson County, Inc.</u>, 392 F.3d 939, 940-43 (7th Cir. 2004); <u>New Century Mortgage Corp. v. Great Northern Ins. Co.</u>, 2006 U.S. Dist. LEXIS 50809 at *12-19 (N.D. Ill. July 25, 2006); <u>American Home Assur. Co. v. McLeod USA</u>, 2006 U.S. Dist. LEXIS 49208 at *4-10 (N.D. Ill. July 5, 2006); <u>St. Paul Fire & Marine Ins. Co. v. Brunswick Corp.</u>, 405 F. Supp. 2d 890, 893-95

Co., 407 F.3d 631, 642 (4th Cir. 2005) (applying Virginia law and ruling that "the privacy prong of the advertising injury provision cannot be construed to cover a violation of the TCPA"). Nothing about the facts or the applicable law could support a different ruling in this case. St. Paul is entitled to a judgment declaring as a matter of law that it has no duty to defend or indemnify Herbalife in the underlying action.

**B.    The underlying TCPA complaint does not allege a claim based on "making known" of "material."**

The making-known-material element requires disclosure of informational content to someone other than the complaining party. This element demonstrates that the policy covers liability for invasion of one's secrets not invasion of the sort of privacy interest affected by prohibited automated-caller intrusions, which involve no such disclosure. *See* American States Ins. Co. v. Capital Assoc. of Jackson Cty. Inc., 392 F.3d 939, 942 (7th Cir. 2004)(finding no advertising-injury coverage for TCPA liability and stating that "the central question in this case [is] whether the policy covers the sort of seclusion interest affected by the faxed ads").

---

(N.D. Ill. 2005); Erie Ins. Exch v. Kevin T. Watts, Inc.., 2006 U.S. Dist. LEXIS 35828 at *11-17 (S.D Ind. May 30, 2006); Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co., 2006 U.S. Dist. LEXIS 21112 at *19-43 (E.D. Pa. Apr. 19, 2006); Terra Nova Ins. Co. v. Metro. Antiques, 2006 Mass. Super. LEXIS 7 at *8-14 (Mass. Super. Ct. Jan. 24, 2006); ACS Systems, Inc. v. St. Paul Fire & Marine, No. BC305455, slip. op. at 2 (Super. Ct. Cal., Los Angeles County, Feb. 9, 2005); Advent Home Mortgage Corp. v. Hartford Cas. Ins. Co., No.06-1582 slip. op. at 9-10 (E.D. Pa. Aug. 14, 2006); contra Park Univ. Enters. v. Am. Cas. Co., 442 F.3d 1239, 1247-51 (10th Cir. 2006); Hooters of Augusta, Inc. v. American Global Ins. Co., 157 Fed. Appx. 201, 205-10 (11th Cir. 2005); Univ. Under. Ins. Co. v. Lou Fusz Auto. Network, Inc., 401 F.3d 876, 878-83 (8th Cir. 2005); Western Rim Investment Advisors, Inc. v. Gulf Ins. Co., 269 F. Supp. 2d 836, 845-50 (N.D. Tex. 2003) aff'd 96 Fed. Appx. 960 (5th Cir. May 19, 2004); Nutmeg Ins. Co. v. Employers Ins. Co., 2006 U.S. Dist. LEXIS 7246 at *20-34 (N.D. Tex. Feb. 24, 2006); Registry Dallas Assoc., L.P. v. Wausau Bus. Ins. Co., 2004 U.S. Dist. LEXIS 5771 (N.D. Tex. Feb. 26, 2004); Prime TV, L.L.C. v. Travelers Ins. Co., 223 F. Supp. 2d 744, 752-53 (M.D.N.C. 2002); Valley Forge Ins. Co. v. Swiderski Elec., Inc., 834 N.E.2d 562, 566-76 (Ill. App. Ct. 2d Dist. 2005); TIG Ins. Co. v. Dallas Basketball, Ltd., 129 S.W.3d 232, 236-39 (Tex. App. Dallas 2004), review denied 2005 Tex. LEXIS 602 (Tex. Aug. 22, 2005). All of the cases interpreting St. Paul's unique definition of "advertising injury," have found that there is no coverage for TCPA claims. *See* Resource Bankshares, 407 F.3d. at 639-43; Melrose Hotel, 2006 U.S. Dist. LEXIS 2112 at *19-43; ACS, No. BC305455, slip. op. at 2 (Super. Ct. Cal., Los Angeles County, Feb. 9, 2005).

It's true that the notion of privacy has more than one sense, depending on the context in which it is used.  As the Fourth Circuit in <u>Resource Bank</u> points out, privacy when used in one sense means secrecy in one's private information, and when used in another means the protection against intrusion into one's seclusion.  407 F.3d at 640 n.9.  *See also,* <u>American States</u>, 392 F.3d at 941 (stating that "'[p]rivacy is a word with many connotations.  The two principal meanings are secrecy and seclusion, * * *").  But the meaning of the term "right of privacy" in the policy must derive from the context in which it is used.  <u>Glen Falls Ins. Co. v. Smith</u>, 217 W.Va. 213, 617 S.E.2d 760, 770 (2005) (stating that policy terms are defined within the policy's context, and ruling that "[t]his Court is more persuaded by the ample case law viewing the term in context * * *"); <u>Soliva v. Shand</u>, 176 W.Va. at 430, 345 S.E.2d 33, 35 (1986) (stating that policy provisions may not be interpreted out of their context). Here, coverage applies only if the violation of a person's right of privacy occurs in a specified way – by making known material.  In the context of the policy, therefore, "right of privacy" can only be understood in the sense of secrecy, where making known means revealing, and material means informational content.  As the Fourth Circuit points out, "the advertising-injury offense part of the policies is <u>exclusively</u> concerned with those types of privacy (<u>Prosser</u> n.9) which, like secrecy, are implicated by <u>content</u> of the advertisements."  <u>Resource Bank</u>, 407 F.3d at 641 (first emphasis added, second emphasis in original).  *See also,* <u>American States</u>, 392 F.3d at 942 ("The structure of the policy strongly implies that coverage is limited to secrecy interests.  It covers a 'publication' that violates a right of privacy.  In a secrecy situation, publication matters; otherwise secrecy is maintained.  In a seclusion situation, publication is irrelevant").[8]  In short, the policy's making-known-material

---

[8] The policy in <u>American States</u> required a "publication," while St. Paul's policy requires "making known."  To the extent there is a difference between those requirements, courts have recognized that St. Paul's "making known" provision most strongly rejects coverage for TCPA liability.  Indeed, the two circuit courts of appeal that have found advertising-injury coverage for TCPA liability have examined

element and the context in which it appears makes clear that coverage applies only to liability for violation of privacy in the sense of secrecy, liability that occurs only when informational content (material) is disclosed (made known) to someone other than the one who claims the right to keep the material private.

By contrast, automated-caller liability under the TCPA is for the invasion of privacy in the sense of intrusion upon seclusion, as occurs when the phone rings with a recorded solicitation during family dinner or in the middle of movie night.  *See* <u>Melrose Hotel</u>, 432 F. Supp.2d at 501-02 (rejecting insured's argument that "it is the content of the faxed material that gives rise to the violation [of the TCPA].").   Congress enacted the TCPA's automated caller restrictions to address privacy concerns only in that sense.  *See, e.g.*, Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 §1462, 105 Stat. 2394, Findings at Sec. 2(6) & (10) (2006) (stating that "[t]he Congress finds that:  * * * (6)  Many consumers are outraged over the proliferation of <u>intrusive</u>, nuisance calls into their homes from telemarketers.  * * * (10)  Evidence compiled by Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, <u>regardless of content</u> or the initiator of the message, to be a nuisance and an invasion of privacy")(emphasis added).  As the Fourth Circuit puts it, "if the [TCPA] class-action complaint alleges any violation of privacy, it is 'seclusion' privacy.  It is concerned with the manner of the advertisement."   <u>Resource Bank</u>, 407 F.3d at 641.  The policy, which is

---

offense language that uses "publication" in lieu of "making known," and both have distinguished <u>Resource Bank</u> on that basis.  *See* <u>Hooters of Augusta, Inc. v. American Gobal Ins. Co.</u>, 157 Fed. Appx. 201, 205-10 (11th Cir. 2005)(distinguishing <u>Resource Bank</u> on the ground that "the Fourth Circuit case involved a more tightly worded advertising-injury provision that described the covered activity as 'making known * * * material that violates a person's right of privacy.'  This wording seems to have been a significant factor in the court's decision"); <u>Park Univ. Enterp., Inc. v. American Cas. Co.</u>, 442 F.3d 1239, 1249 n.5 (10th Cir. 2006)(distinguishing the Fourth Circuit decision on the ground that "[t]he court in <u>Resource Bankshares</u> examined a policy with language distinct from the policy language at issue here. * * *  Hence, the court's determination that this language did not provide coverage for an invasion of seclusion claim under the TCPA is not determinative of the issue here").   Thus, <u>Hooters</u> and <u>Park University</u> are not even passing authority for a finding of coverage under St. Paul's distinctive "making known" element.

15

exclusively concerned with secrecy-type privacy rights (<u>Resource</u>, 407 F.3d at 641),  provides no coverage for TCPA liability because the privacy right protected under the statute is the interest in seclusion.

Moreover, the violation of a TCPA seclusion right occurs in a manner different from what the policy requires for coverage.  While the policy requires the revealing of informational content, a TCPA violation occurs when the offending party uses a prohibited <u>means</u> of conveyance, means like facsimiles and automated callers that Congress has determined are likely to intrude upon the recipient's seclusion.  *See* <u>American States</u>, 392 F.3d at 943 (stating that the TCPA "condemns a particular <u>means</u> of communicating an advertisement, rather than the contents of that advertisement – while an advertising-injury coverage <u>deals with informational content</u>")(emphasis added).  Thus, the Fourth Circuit was absolutely correct in holding that the making-known-material requirement, when read in context, means revealing private information to someone other than the plaintiff:

> Consider closely the text **and context** of the operative sentence.  * * *  It requires undue strain to believe that sending an unsolicited fax ad [in violation of the TCPA] that has no private information or content * * * can reasonably be said to "make known" material that violates a person's right of privacy.  It surely seems to us that the plainest and most common reading of the phrase indicates that "making known" implies telling, sharing or otherwise divulging, such that **the injured party is the one whose private material is <u>made known</u>, not the one <u>to whom</u> the material is made known.**

<u>Resource Bank</u>, 407 F.3d at 641 (bold emphasis added, other emphasis in original) (footnote omitted).  *See also*, <u>American States</u>, 392 F.3d at 492 ("In a secrecy situation, publication matters, otherwise secrecy is maintained.  In a seclusion situation, publication is irrelevant"); <u>Bowyer</u>, 609 S.E.2d at 911-13 (finding coverage for secrecy-type violation where secretly recorded material shared with plaintiff's co-employees).  Making known material means revealing information to someone else.  The underlying complaint does not allege liability for the

making known of material; therefore, as a matter of law St. Paul has neither the duty to defend nor the duty to indemnify.  (Exhibit K, Policy, K-26).

Other West Virginia rules of insurance policy construction require the same conclusion. First, every provision in an insurance policy must be given effect; no word or phrase may be rendered superfluous.   Justice v. Stuyvesant Ins. Co., 265 F. Supp. 63, 65 (S.D. W.Va. 1967)(stating that "[i]n the interpretation of a written contract every part of the contract must, if possible, be made to take effect, and every word of it must be made to operate in some shape or other"); see also Mirpad v. Cal. Ins. Guar. Ass'n, 132 Cal. App.4th 1058, 1072 (2005).   If "making known material" were construed to include a TCPA-prohibited automated-caller communication with the complaining parties themselves – as Herbalife will undoubtedly contend – the above rule of construction would be violated.  That's because such a construction would render the making-known-material element a superfluous redundancy.

Under the policy, coverage for an advertising injury requires that:  (1)  the advertising injury must result from Herbalife's "advertising" its product or work; and (2)  the advertising injury must be caused by an "advertising injury offense."  (Exhibit K, Policy, K-26).  A finding of "advertising" is therefore a prerequisite to coverage.   The policy defines advertising as "attracting the attention of others for the purpose of seeking customers or increasing sales or business."  (Id. at K-25).  Although the parties agree for purposes of this motion that the automated-caller communications satisfy the advertising requirement, Herbalife must also establish the elements of an advertising injury offense, including "making known material."  But since all advertising, by the policy's own definition, involves a communication to the recipient, Herbalife's reasoning would mean that all advertising would inherently satisfy the policy's making-known requirement, leaving no reason to include that requirement in the subsequently defined offense.  This is so because Herbalife's automated calls are a communication with the

17

complaining party to attract his or her attention for the purpose of increasing sales or business. Herbalife would now say that those same activities are "making known material," where the "making known" is the communication with the complaining party and the "material" is the content seeking business.  Such a construction results in an impermissible redundancy under West Virginia law.   A separate meaning is given to the policy's making-known-material requirement, as the law requires, only when "making known" is understood to mean something beyond a bare advertising communication and "material" is understood to mean content beyond the bare seeking of customers or business.[9]  "Making known material" means disclosure of protected information to others – a secrecy violation – a policy requirement that is not met here.

Second, part of the requirement that terms be construed within the context of the policy is the rule – expressed with the Latin noscitur a sociis, meaning "it is known from its associates" – requiring that terms be construed consistently with immediately surrounding terms.  Change, Inc. v. Westfield Ins. Co., 208 W.Va. 654, 542 S.E.2d 475, 478-79 (2000); see also, Curtis-Universal, Inc. v. Sheboygan Emerg. Med. Servs., 43 F.3d 1119, 1124 (7th Cir. 1994), rehearing denied (1995) (applying noscitur a sociis to determine the breadth of term "unfair competition" in advertising-injury coverage and stating that "[a] word sometimes picks up meaning from its neighbors; and all the other terms in the list of wrongs insured under the rubric of 'advertising injury' concern the misuse of information, as befits the word 'advertising'").  Palmer v. Truck Ins. Exch., 21 Cal. 4th 1109, 1116-18 (1999).  Here, the advertising offense at issue is part of a list that includes three other offenses, including libel or slander, making known material that

---

[9] Of course, a different outcome would apply if the policy contained no requirements beyond advertising and the violation of a person's right of privacy, that is, if there were no making-known-material or material-that-violates requirements.  Those were the facts in Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc., 401 F.3d 876 (8th Cir. 2005), where the Eighth Circuit found coverage for TCPA liability under a policy that defined a covered offense with the unmodified phrase "invasion of rights of privacy."

disparages another's products, and unauthorized use of advertising material.  (Exhibit K, Policy, K-26).  Each of these other offenses focuses on the communication of informational content to others, in the course of advertising activities, and the injurious effect this has on the claimant.  None focus on the means of conveyance or include communication with the claimant.  It would violate fundamental rules of insurance policy construction to carve out a method-of-transmission-to-the-claimant offense from this group.  And that is exactly what the <u>Resource Bank</u> court concluded based upon an identical list of four advertising-injury offenses, stating that "these four offenses all share the common thread of assuming that the victim of the advertising injury offense is harmed by the sharing of the <u>content</u> of the ad, not the mere <u>receipt</u> of the advertisement."  407 F.3d at 641 (emphasis in original)(citing <u>Select Design, Ltd. v. Union Mut. Fire Ins. Co.</u>, 165 Vt. 69, 674 A.2d 798, 802 (1996)(stating that "[t]he term 'advertising injury,' as * * * construed in an overwhelming majority of reported cases, is injury to another that results from the <u>content</u> of statements about the products or services of the insured")).  The context of the privacy offense makes clear that "making known material" means disclosure of informational content to someone other than the complaining party.

In sum, offense-based coverage is inapplicable unless the insured's liability arises from actionable conduct that consists of the elements comprising a covered offense.  A covered offense is missing here because the TCPA is concerned with the right of privacy in the sense of <u>seclusion without regard to informational content</u>.  The TCPA does this by prohibiting a means of conveyance.  By contrast, the policy provides coverage only for conduct that violates the right of privacy in the sense of <u>secrecy based upon disclosure of private information to someone else</u>.  As a matter of law, TCPA liability is not based upon making known of material.  Therefore, St. Paul is entitled to a judgment declaring as a matter of law that it has no duty to defend or indemnify Herbalife in the underlying action.

**C.     The underlying TCPA complaint does not allege a claim based on "material that violates" a person's right of privacy.**

The policy's plain language – as the Fourth Circuit describes it in <u>Resource Bank</u>, "written in admirably plain English" (407 F.3d at 634) – requires that the antecedent "written or spoken material" inform the verb "violates."  Thus, it is the <u>material</u> that must violate a right of privacy, not the making known by itself.  *See* <u>St. Paul Fire & Marine v. Brunswick Corp.</u>, 405 F. Supp. 2d 890, 895 (N.D. Ill. 2005)(construing similar St. Paul policy language as providing no coverage for TCPA liability, in part because "[a]s written, the phrase 'violates a person[']s right of privacy' refers <u>to the content</u> of the material published, <u>not from the publishing itself</u>")(emphasis added)); *see also* <u>State Farm Mut. Auto. Ins. Co. v. Eastman</u>, 158 Cal. App.3d 562, 568-69 (1984) (applying last-antecedent rule).  But the underlying complaint does not allege that the advertising material – the content itself – violated anyone's solitude.  It alleges that the means of conveyance did.  Indeed, the TCPA does not regulate content, much less provide that it is the content that violates the recipient's rights.  In fact, the TCPA's legislative history plainly states that the act is not intended to regulate content at all, but instead is intended to regulate the manner in which advertising is conveyed.[10]

In short, regardless of whether a pre-recorded commercial communication to the complaining party satisfies the policy's "making known" element, the policy does not allow coverage for a "making known that violates."  Instead, the policy requires the making known <u>of</u>

---

[10] *See* S. Rep. No. 102-178, at 4 ("The reported bill does not discriminate based on the <u>content</u> of the message. It applies equally whether the automated message is made for commercial, political, charitable or other purpose.  The reported bill regulates the <u>manner</u> . . . of speech and the <u>place</u> (the home) where the speech is received. The Supreme Court has recognized the legitimacy of reasonable time, place and manner restrictions on speech when the restrictions are <u>not based on the content</u> of the message being conveyed.") (emphasis added).

material that violates.[11]   Under the TCPA, however, it is only the means of conveyance that violates.  Indeed, if a flyer with a word-for-word identical message were sent by mail – or even delivered personally after incessant knocking on the front door at dinner time – it would not be actionable, even though the material (the content) would be the same.   Nor would an automated commercial call be any less actionable if the language on the recording were foreign to the call recipient or if the recipient hung up on the recording without hearing out the message content.  That's true because it is the means of conveyance, not the material content, that gives rise to TCPA liability.  And what differentiates the mail or door knocking from the automated dialer is not the material; it is the means of conveying it.  Nothing about a TCPA offense satisfies the policy's requirement that there be a making known of "material that violates" a person's right of privacy.  *See* American States, 392 F.3d at 943 (stating that the TCPA "condemns a particular means of communicating an advertisement, rather than the contents of that advertisement – while an advertising-injury coverage deals with informational content")(emphasis added); Resource Bank, 407 F.3d at 641 (stating that the underlying TCPA class action "is concerned with the manner of the advertisement.  In contrast, the advertising-injury offense part of the policies is exclusively concerned with those types of privacy [that] * * * are implicated by content of the advertisements")(first emphasis added).   Because the underlying action is not based upon

---

[11] This is one of many analytical errors made by the Illinois Court of Appeals in Valley Forge Ins. Co. v. Swiderski Elecs., Inc., 359 Ill. App. 3d 872, 885 (Ill. App. Ct. 2d Dist. 2005), review granted (Ill. 2006).  In that case – which is currently pending before the Illinois Supreme Court – the appellate court found coverage for TCPA liability, reasoning that "because transmitting an unwanted facsimile constitutes an intrusion upon seclusion, it violates one's right of privacy."  359 Ill. App. 3d at 887 (emphasis added).  But while that describes a TCPA violation, it does not describe the policy's advertising-injury offense because it skips past the policy requirement of "material that violates."  Again, even if one were to accept that an automated call (or a facsimile) to the complaining party is a "making known," still the policy does not allow coverage for a "making known that violates."  It must be the material that violates a right of privacy, or there is no coverage.  Typical of other courts that have found advertising-injury coverage for TCPA liability, the Valley Forge decision failed to address this argument.

"material that violates a person's right of privacy," St. Paul is entitled to a judgment declaring as a matter of law that it has no duty to defend or indemnify Herbalife in the underlying action.

### Conclusion

The <u>Mey</u> complaint does not assert claims that fall within St. Paul's policy's Advertising Injury coverage.  St. Paul respectfully requests that this Court grant partial summary judgment in its favor.

Dated this 24th day of August, 2006.

**DEFENDANT, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, By Counsel:**


/s/ Tiffany R. Durst
_____

| | |
|---|---|
| James A. Varner, Sr. | State Bar No. 3853 |
| Tiffany R. Durst | State Bar No. 7441 |
| Debra Tedeschi Herron | State Bar No. 6501 |

BB&T Bank Building, Fourth Floor
Post Office Drawer 2040
Clarksburg, West Virginia  26302-2040
Telephone.: (304) 626-1100
Facsimile: (304) 623-3035

McNeer, Highland, McMunn & Varner, L.C.
   Of Counsel